PRENTICE *v.* NORTHERN PAC. R. Co. *et al.*

(*Circuit Court, D. Minnesota.* July 14, 1890.)

DEED—DESCRIPTION.

A deed described the land conveyed as beginning at a certain rock, and running thence one mile east, one mile north, one mile west, and one mile south, to place of beginning; and also stated that it was the land set off to a certain Indian under a treaty with the government. The Indian had previously selected his land as "a tract one mile square, the exact boundaries of which may be defined when the surveys are made." After the deed was given, the Indian's land was located and patented so as to include 640 acres not in the form of a square, no part of which lay within the boundaries named in said deed. *Held,* that the deed, being for a specific tract of land, could not be construed to convey the grantor's interest in the land actually patented to the Indian.

At Law.

This action having been brought to trial before the court without a jury, which was waived by the parties by a stipulation in writing duly filed with the clerk, the following facts are found by the court:

(1) That the treaty made and concluded on the 30th day of September, A. D. 1854, between the United States and the Chippewa Indians, of Lake Superior and the Mississippi, whereby said Indians ceded to the United States certain territory lying adjacent to the headwaters of Lake Superior, contained the following provisions, viz.:

"And being desirous to provide for some of his connections, who have rendered his people important services, it is agreed that Chief Buffalo may select one section of land at such place in the ceded territory as he may see fit, which shall be reserved for that purpose, and conveyed by the United States to such person or persons as he may direct."

(2) That said treaty was ratified, pursuant to a resolution of the United States senate passed on the 10th day of January, 1855, by the president of the United States, on the 29th day of January, 1855.

(3) That the said Chief Buffalo, pursuant to said provision of said treaty, and on the day of the date thereof, to-wit, September 30, 1854, by an instrument of writing executed by him and filed in the office of the United States commissioner of Indian affairs at Washington, D. C., selected the land to be conveyed thereunder by the United States, and appointed the persons to whom it was to be conveyed, as follows, viz., after reciting the foregoing provision of the treaty:

"I hereby select a tract of land one mile square, the exact boundary of which may be defined when the surveys are made, lying on the west shore of St. Louis bay, Minnesota territory, immediately above and adjoining Minnesota point; and I direct that patents be issued for the same according to the above-recited provision to Shaw-bwaw-skung, or Benjamin G. Armstrong, my adopted son; to Matthew May-dway-gwon, my nephew; to Joseph May-dway-gwon and Antoine May-dway-gwon, his sons,—one quarter section to each."

(4) That said Matthew, Joseph, and Antoine, under date of September 17, 1855, executed and delivered to said Armstrong an instrument assigning to him their right, title, and interest under said appointment and selection of Chief Buffalo.

(5) That said Benjamin G. Armstrong and wife, on September 11, 1856, made, executed, and delivered to the plaintiff herein a deed of conveyance.

(6) That said deed from Armstrong to plaintiff was duly recorded in the county of St. Louis, territory of Minnesota, on the 4th day of November, A. D. 1856.

(7) That the pieces or parcels of land, the title to which is involved in this action, are situated in said county of St. Louis, territory (now state) of Minnesota.

\* \* \* \* \* \* \* \*

(9) That the tract of land which Chief Buffalo had designated as his selection on the day of the treaty did not correspond with the section lines when the land came to be surveyed into sections; and, furthermore, part of it was found to be occupied and claimed by certain Indian traders under the treaty. After a lengthy correspondence and investigation in the department of the interior, the relatives of Buffalo entitled to the land reserved for them conceded the validity of the claim of these Indian traders, and in lieu of the lands thus held by traders received other lands adjacent to that selected by Buffalo to make up the quantity of 640 acres, but not in the form of a parallelogram, though maintaining a continuous connection.

\* \* \* \* \* \* \* \*

(11) That the United States government surveys of the lands ceded by said treaty of September 30, 1854, to the United States had not been made at the date of the said deed from Armstrong to plaintiff, and were not made until the year following the date thereof.

(12) That said Armstrong and wife, by warranty deed duly executed and recorded, dated October 22, 1859, conveyed an undivided half of the lands conveyed to him, and the other appointees of Chief Buffalo aforesaid, by the United States, by said patent of October 23, 1858, to Daniel S. Cash and James H. Kelly.

(13) That after said patents were issued to said appointees, as aforesaid, the said Matthew, Joseph, and Antoine, on March 13, 1859, executed deeds of conveyance of the land which had been so patented to them respectively to the said Armstrong, which deeds were duly recorded in said St. Louis county, May 17, 1859; and that the said Armstrong and wife, on the 31st day of August, 1864, for a valuable consideration, executed and delivered their deed of conveyance of an undivided half of the land so patented to him and the said Matthew, Joseph, and Antoine to John M. Gilman, which conveyance was duly recorded in said St. Louis county, September 12, 1864. That said Gilman took said conveyance without any actual notice of said deed from said Armstrong to the plaintiff of September 11, 1856, or that plaintiff claimed an interest in the land so conveyed to him, said Gilman.

(14) That the defendants herein claim title to the pieces or parcels of land in controversy as grantees of said Gilman, and under and through said deed to said Gilman of August 31, 1864.

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

(16) The court further finds that the large stone or rock at the head of St. Louis river bay, nearly adjoining Minnesota point, described in the deed from Armstrong to Prentice in the fifth finding of fact, the beginning of the boundary of the tract conveyed, is well identified, and was generally known to the few people familiar with the place, and is recognizable now. And a mile square measured from that point, as called for in the deed, would wholly depart from the shore of St. Louis bay, and would cover about one-half or three-fifths land, and the remainder the water of Lake Superior.

· (17) That the land selected by Buffalo Chief lay upon the shore of St. Louis bay, immediately adjoining Minnesota point; and this selection is followed as near as it could be by the patents of the United States, issued to satisfy that reservation, considering the elimination from the mile square of the lands held by the traders, and the vagueness of Buffalo's description, and the necessity of conforming the final grant to the surveys of the United States.

(18) If the lines of the course called for as east and west, in the deed of Armstrong to Prentice, under which the plaintiff asserts his title, were exactly reversed, the description in that deed would include a large part of the land actually selected by Buffalo Chief, and also included in the patents from the United States; but it would not include the land sued for in this complaint.

(19) That the said instrument executed by the Chief Buffalo dated September 30th, 1854, was the only selection or appointment ever made by Buffalo Chief under the sixth clause of the second article of the said treaty.

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

(21) That at the date of said deed, September 11, 1856, from Armstrong to Prentice, said Armstrong did not have any interest in land in said St. Louis county, Minnesota Territory, except what he was entitled to under the Buffalo selection and appointment referred to in the third paragraph hereof, and under the assignment from the other appointees of Buffalo.

And the court found the following conclusions of law thereupon:

· (1) That the appointment of persons to whom the United States were to convey the section of land reserved by the said provision of said treaty, made by the said Chief Buffalo on the 30th day of September, 1854, was a valid and sufficient appointment under said provision, and, upon the ratification of said treaty, vested in the said Benjamin G. Armstrong, and the other appointees named, such an interest as the treaty gave to the land so reserved.

(2) That the patent of the United States to Armstrong, and his acceptance of it, is a valid execution of the treaty on that subject.

(3) That the deed from said Armstrong to plaintiff of date of September 11, 1856, is in its execution, acknowledgment, and recording a valid and sufficient deed, and its record is constructive notice of its contents.

(4) That the description in the deed of said Armstrong to plaintiff of September 11, 1856, is insufficient to convey his interest in or title to any other or different tract of land to which he might have been entitled under said treaty than the tract described therein, and that said deed is ineffectual as a conveyance to plaintiff of any interest or title, except such as said Armstrong had in or to the land therein described, and that plaintiff thereunder took no title to the land for the possession of which this action is brought.

(5) That the quitclaim deed from said Armstrong to said John M. Gilman of August 31, 1864, conveyed to the said Gilman such interest, and no more, as said Armstrong had in the land therein described at the date of said deed.

(6) That the plaintiff is not entitled to recover in this action, and judgment is ordered for the defendants for their costs and disbursements.

*Root & Clarke, Dillon & Swayne,* and *Kitchel, Cohen & Shaw,* for plaintiff.

*Cash & Williams, John C. Bullitt, Jr., Frank B. Kellogg,* and *Wm. H. Bliss,* for defendants.

MILLER, Justice. Although this action of ejectment brought by Frederick Prentice is against other defendants, and his claim is for a different piece of land, the title under which he and the defendants claim was the subject of consideration in a former suit in this court, which was reported as *Prentice* v. *Stearns,* 20 Fed. Rep. 819. That case went to the supreme court of the United States, where the judgment of this court was affirmed, and is reported in 113 U. S. 435, 5 Sup. Ct. Rep. 547. There was in that case a very elaborate finding of facts by this court, which is found at length in the report of the case in 113 U. S. and 5 Sup. Ct. Rep. As the suit before us is not between the same parties as the former suit, what was decided in that case in the supreme court is only binding in the consideration of the present case, as far as it establishes the law applicable to such case. As the case is submitted to us without the intervention of a jury, we have made a new finding of fact, in some respects differing from that which we made in the former case. These differences may become material in the formation of the judgment on the title.

The principal question before us in the former case, which was decided against the plaintiff, is reargued before us at this time with much earnestness and fullness. We held at that time that the deed from Armstrong to Prentice, under which alone plaintiff can assert a title to the land in controversy, was an instrument designed to convey a defined tract or parcel of land, and was not, as contended for by counsel for plaintiff, intended to convey any possible interest which existed in Armstrong under the treaty with the Chippewas, referred to in the findings of fact, and under the selection of Buffalo Chief, according to the provision of that treaty, and the appointment by Buffalo Chief that the lands selected by him should by the United States be conveyed to Armstrong and three other parties, relatives of Buffalo. That principle, as this court decided it, was affirmed by the supreme court of the United

States. After a full reconsideration of the subject, in the light of such new facts as the counsel for the plaintiff supposed they have produced on the present hearing, we remain of the opinion we were on the former trial. The first descriptive clause of the deed from Armstrong to Prentice is of a tract of land a mile square, beginning at a large stone or rock, which, as a matter of fact, we find in the present case is now identified, and was well known at the time the deed was made. The description proceeds with the points of the compass one mile east, one mile north, one mile west, one mile south, to the place of beginning. It would be difficult, the beginning point being well ascertained, to imagine that Armstrong intended to convey any other land, or any other interest in land, or interest in any other land, than that so clearly described. And, if that description is to stand as a part of the deed made by Armstrong to Prentice, it leaves no doubt where the land was; and there is no occasion to resort to any inference that he meant any other land than that. It is now found as a fact that this boundary would include a surface from one-half to three-fourths of which is land and the remainder is water of Lake Superior. For that reason, and for others which may be hereafter considered, counsel for plaintiff reject totally this part of the description of the land found in the conveyance, and proceed to consider the remaining part, which says: •

"Being the land set off to the Indian Chief Buffalo at the Indian treaty of September 30, A. D. 1854, and was afterwards disposed of by said Buffalo to said Armstrong, and is now recorded with the government documents."

If we could reject the first description as incorrect and erroneous, and come to the latter part of it, we are constrained to hold that this alone is not sufficiently certain to convey any definite tract of land one mile square, or nearly so. No person taking the treaty and the selection of Buffalo, and all that was known about that selection that was to be found in the records of the government documents upon that subject, could proceed to survey a mile square, or a section of 640 acres in a square form, so as to comply with the terms of the deed. Nevertheless it is made quite evident, both by the first clause of the description, and by the reference to the selection made by Buffalo, and to the recorded documents with the government, that the grantor in that deed supposed that he was describing a specific piece of land, and that both the description by metes and bounds and the description with reference to the Buffalo selection were the same, and were identical. If this deed is void because that description is either erroneous, as is alleged in the first clause, or is so uncertain, as regards the second clause, that it cannot be identified or found out or surveyed, then the deed is simply a void instrument. To avoid this difficulty, counsel insists that the object of the grantor and the grantee in this deed was another and a different object than the sale and conveyance of a specific and definite piece of land. They say that the reference to the land set off to the Indian Chief Buffalo at the treaty of 1854 meant, not any definite piece of land, but any land which might come to Buffalo or to his appointees, of whom Armstrong is one, by the future proceedings of the government of the United States

in that case; and that, no matter where such land was found, provided it was within the limits of the land granted by the Chippewa treaty, then the deed from Armstrong to Prentice was intended to convey such after-acquired interests when it was patented to the parties by the United States. We do not see anything in the whole deed or transaction between Armstrong and Prentice that points to or indicates any such construction of it. Both clauses of the description are definite as to the land conveyed, and treat it as a piece of land well described, well known, and well defined. Of course, any man endeavoring to ascertain what land was conveyed under that grant would suppose that, when he found the stone or rock, which we now as a matter of fact find to have an existence, and can be well identified, he had bought a mile square according to the points of the compass, the south-west corner of which commenced on that rock. He would not suppose that he had bought something that might be substituted in lieu of that mile square by future proceedings of the government of the United States. And so, with regard to the other description, Buffalo had made his selection, had described the land which he designed to go by that treaty, not to him, but to his relatives, whose names are given, and it was an undivided half of this land thus selected by the Buffalo Chief, and not other land or different land which might come to Armstrong, that he conveyed and intended to convey to Prentice.

Much stress is laid upon cases found in the supreme court of the United States, referred to in the case of *Prentice* v. *Stearns*, already decided. Between the cases of *Doe* v. *Wilson* and *Crews* v. *Burcham* and this a broad difference exists. The lands reserved by treaty in those cases to the parties who conveyed their interests to others never had been described, never had been selected, and it was only known that they would be entitled to a certain amount of land afterwards to be selected by the president under that treaty. In the case of *Doe* v. *Wilson*, 23 How. 457, the language of the court is that the reservation created an equitable interest in the land to be selected under the treaty; that it was the subject of sale and conveyance; that Pet-chi-co was competent to convey it; and that his deed, upon the selection of the land, and the issue of the patent, operated to vest the title in his grantee. In that case Pet-chi-co could not have conveyed anything more specific than his general right to such congressional subdivision of land as the president might afterwards allot to him. In conveying his interest he conveyed the equitable interest which he had in such allotment when it should be made. Such was also the case of *Crews* v. *Burcham*, 1 Black, 352. The deed there recites a reservation to the grantors of a half section under the treaty, which is to be located by the president after the land was surveyed, and then for a valuable consideration the grantor conveys all his right. In that case no description of land could be given, because none was supposed to exist; the president had yet to select and identify it. But in the case before us, not only had Buffalo made his selection, and designated the parties to whom the land should go, but the selection had definiteness about it to a certain extent; it was a thing which could

be conveyed specifically, and which Armstrong undertook to convey specifically. It is not necessary that we resort to the supposition that Armstrong was talking about some vague and uncertain right,—uncertain, at least, as to locality, and as to its relation to the surveys of the United States,—which he was intending to convey to Prentice, instead of the definite land which he described or attempted to describe. If such were his purpose in this conveyance, it is remarkable that he did not say so in the very few words necessary to express that idea, instead of resorting to two distinct descriptive clauses, neither of which had that idea in it, one of which is rejected absolutely by plaintiff's counsel as wholly a mistake, and the other is too vague in its language to convey even what plaintiff claimed for it. We are not able, therefore, to hold with counsel for plaintiff that, if this conveyance does not carry the title to any lands which can be ascertained by that description in the deed, resort can be had to the alternative, that the deed was intended to convey any land that might ultimately come to Armstrong under the treaty, and under the selection, and under the assignment to Buffalo. There is a view of this subject which has given us considerable embarrassment. If the east and west courses of the first clause of the description in the Armstrong deed to Prentice were exactly reversed, the land described in it would be found on St. Louis bay, somewhere along the shores of that bay, adjacent to and above Minnesota point, and would include much of the land which was patented by the United States to Armstrong and his associates in satisfaction of the treaty grant to Buffalo; and we should find ourselves called upon to decide whether, under all the circumstances, we would not be compelled to regard these two east and west lines as mistakes, and reverse them in seeking for the land, because in that case we should certainly fall upon some of the land which Buffalo intended to select, and which the government of the United States has patented in satisfaction of that selection. But we are not called upon in this case to decide upon that subject, because all the land sued for in this case lies south of the southern section line of such a survey, and is excluded from it. Judgment for defendants.